**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

MARK FRANKEL, on behalf of himself and others
similarly situated,

          Plaintiff,

   -against-

CITICORP INSURANCE SERVICES, INC.,
CITICORP VISA, INC., CITICORP
MASTERCARD, INC., CITIBANK (SOUTH
DAKOTA), N.A. and CITIBANK, N.A.,

         Defendants.

Case No. 11-CV-2293 (NGG) (RER)

**Document No. 55**

**Electronically Filed and Served on
September 29, 2014**

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF MARK FRANKEL'S OBJECTION
## TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4600

HARRY I. KATZ, P.C.
61-25 Utopia Parkway
Fresh Meadows, New York 11365
(718) 463-3700

*Attorneys for Plaintiff Mark Frankel*

\761900

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

SUMMARY OF ARGUMENT .......................................................................... 3

ARGUMENT ...................................................................................................... 5

I.  THE FIRST AMENDMENT PETITION CLAUSE COMPELS DENIAL OF
    DEFENDANTS' MOTION TO COMPEL ARBITRATION ........................... 5

    A.  The First Amendment Guaranties the Right to Petition Government Courts ........... 5

    B.  Resolving Disputes in Court Advances Several First Amendment
    Interests that are Not Advanced by Private Arbitration .................................... 7

    C.  The Constitutional Avoidance Doctrine Bars Courts from Interpreting the
    FAA in a Manner that Deprives Citizens of their Right to Petition the Courts ......... 9

        1.  The FAA's Text Does Not Evidence that Congress had a
            Clear Intent to Impinge the Petition Clause ..................................... 12

        2.  The FAA's Legislative History Does Not Evidence that Congress had a
            Clear Intent to Impinge the Petition Clause ..................................... 15

    D.  The Supreme Court's FAA Decisions are Inapposite ............................... 23

II. DEFENDANTS' CLASS ACTION WAIVER IS NOT ENFORCEABLE .................... 24

CONCLUSION ................................................................................................ 25

i

# TABLE OF AUTHORITIES

**CASES**                                                                                      **Page(s)**

*Allied-Bruce Terminix Cos., Inc. v. Dobson,*
    513 U.S. 265 (1995)....................................................................................................13, 15

*American Express Co. v. Italian Colors Restaurant,*
    133 S. Ct. 2304 (2013)............................................................................... *passim*

*AT&T Mobility LLC v. Concepcion,*
    131 S. Ct. 1740 (2011)............................................................................... *passim*

*Atlantic Cleaners & Dyers, Inc. v. United States,*
    286 U.S. 427 (1932)..............................................................................................................7

*BE&K Construction Co. v. NLRB,*
    536 U.S. 516 (2002)................................................................................... *passim*

*Bill Johnson's Restaurants, Inc. v. NLRB,*
    461 U.S. 731 (1983)..........................................................................................................5, 8

*Borough of Duryea v. Guarnieri,*
    131 S. Ct. 2488 (2011)..............................................................................2, 5, 6, 8

*Braun v. E.I. du Pont de Nemours & Co.,*
    No. CIV 04-1007,
    2006 U.S. Dist. LEXIS 37431 (D.S.D. Feb. 7, 2006)..............................................25

*California Motor Transport Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972)............................................................................................................5

*Chambers v. Baltimore & Ohio Railroad Co.,*
    207 U.S. 142 (1907)............................................................................................................5

*Circuit City Stores, Inc. v. Adams,*
    532 U.S. 105 (2001)..........................................................................................................24

*Citizens United v. FEC,*
    558 U.S. 310 (2010)......................................................................................................9, 23

*Daniels v. Arcade, L.P.,*
    477 F. App'x 125 (4th Cir. 2012) ................................................................................5

*Denver Area Educational Telecommunications Consortium v. FCC,*
    518 U.S. 727 (1996)............................................................................................................4

*Durham v. Ciba-Geigy Corp.,*
　315 N.W.2d 696 (S.D. 1982) ...........................................................................................25

*Edward J. DeBartolo Corp. v.*
*Florida Gulf Coast Building & Construction Trades Council,*
　485 U.S. 568 (1988) ............................................................................................10, 11, 15

*Erie Railroad Co. v. Tompkins,*
　304 U.S. 64 (1938) ...........................................................................................................23

*FCC v. Fox Television Stations, Inc.,*
　556 U.S. 502 (2009) ...........................................................................................................9

*Gonzalez v. Carhart,*
　550 U.S. 124 (2007) .........................................................................................................12

*Hammer v. Dagenhart,*
　247 U.S. 251 (1918) .........................................................................................................14

*Homa v. American Express Co.,*
　494 F. App'x 191 (3d Cir. 2012) ......................................................................................1

*Kouichi Taniguchi v. Kan Pacific Saipan, Ltd.,*
　132 S. Ct. 1997 (2012) .....................................................................................................13

*Lusk v. Village of Cold Spring,*
　475 F.3d 480 (2d Cir. 2007)..............................................................................................12

*Maracich v. Spears,*
　133 S. Ct. 2191 (2013) .....................................................................................................13

*Nature's 10 Jewelers v. Gunderson,*
　648 N.W.2d 804 (S.D. 2002) ............................................................................................25

*Nitro-Lift Technologies, L.L.C. v. Howard,*
　133 S. Ct. 500 (2012) .........................................................................................................3

*Parsons v. Ambos,*
　121 Ga. 98 (1904) ............................................................................................................20

*Paul v. Virginia,*
　75 U.S. 168 (1869)............................................................................................................15

*Protect Our Mountain Environment, Inc. v. District Court of County of Jefferson,*
　677 P.2d 1361 (Colo. 1984) ...............................................................................................8

*Ryland v. Shapiro,*
   708 F.2d 967 (5th Cir. 1983) ...................................................................5

*Skilling v. United States,*
   561 U.S. 358 (2010)...................................................................................12

*Southland Corp. v. Keating,*
   465 U.S. 1 (1984)......................................................................................15

*Swift v. Tyson,*
   41 U.S. 1 (1842).......................................................................................23

*Thomas v. Collins,*
   323 U.S. 516 (1945)....................................................................................5

*Thompson v. Thompson,*
   484 U.S. 174 (1988)..................................................................................13

*United States v. Cruikshank,*
   92 U.S. 542 (1876)......................................................................................5

*United States ex rel. Attorney General v. Delaware & Hudson Co.,*
   213 U.S. 366 (1909)....................................................................................9

*United Transportation Union v. State Bar of Michigan,*
   401 U.S. 576 (1971)....................................................................................5

**CONSTITUTION, STATUTES AND RULES**

United States Constitution Amendment I ...............................................5, 7

Federal Arbitration Act ("FAA")
   9 U.S.C. § 1..............................................................................................14
   9 U.S.C. § 2..............................................................................................12

National Labor Relations Act ("NLRA") ......................................10, 11, 12

**LEGISLATIVE MATERIALS**

65 Congressional Record 1931 (1924) ...................................................22

66 Congressional Record 2759 (1925) ...............................................21, 22

66 Congressional Record 2761 (1925) ...................................................21

*Arbitration of Interstate Commercial Disputes: Hearings on S. 1005 and H.R. 646*
*Before the J. Comm. of Subcomms. on the Judiciary,*
    68th Cong. 16 (1924) ..........................................................................................16, 19, 20

*Sales and Contracts to Sell in Interstate and Foreign Commerce,*
*and Federal Commercial Arbitration: Hearings on S. 4213 and S. 4214*
*Before a Subcomm. of the S. Comm. on the Judiciary,*
    67th Cong. (1923) ..........................................................................................16, 17, 18, 19

*To Make Valid and Enforceable Certain Agreements for Arbitration,*
    S. Rep. 68-536, 68th Cong. (1924) ....................................................................21, 22


**OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts*  (2012) ......................................................7, 9, 13

Carol Rice Andrews, *A Right of Access to Court Under the Petition Clause of the First*
*Amendment: Defining the Right,*
    60 Ohio St. L.J. 557 (1999)..........................................................................................5, 6, 7

David S. Schwartz, *Correcting Federalism Mistakes in Statutory Interpretation:*
*The Supreme Court and the Federal Arbitration Act,*
    67 Law & Contemp. Prob. 5 (2004) .................................................................... *passim*

James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a*
*First Amendment Right to Pursue Judicial Claims Against the Government,*
    91 Nw. U. L. Rev. 899 (1997) ..........................................................................................6

James Madison, House Debates (Aug. 15, 1789), *reprinted in*
2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ......................................7

Jean R. Sternlight, *Creeping Mandatory Arbitration: Is It Just?,*
    57 Stan. L. Rev. 1631 (2005)..........................................................................................8

Margaret L. Moses, *Statutory Misconstruction: How The Supreme Court*
*Created A Federal Arbitration Law Never Enacted By Congress,*
    34 Fla. St. U. L. Rev. 99 (2006) ..........................................................................8, 16, 17, 22

*Webster's New Modern English Dictionary* (*Illustrated*) (1925) ......................................13, 14, 22

http://en.wikipedia.org/wiki/Thomas_J._Walsh ..........................................................................17

## INTRODUCTION

As Magistrate Judge Reyes' Report and Recommendation ("R&R") recognizes, enforcing Defendants' adhesion compulsory arbitration clause against Plaintiff Frankel effectively would leave him without a remedy for his losses stemming from Defendants' fraud, and it would disable him from obtaining a public injunction preventing Defendants from continuing to defraud other customers enrolled in their Voluntary Flight Insurance Program. *See* R&R at 1-2, 15-17. Magistrate Judge Reyes concludes that these harsh results are mandated by the Supreme Court's 5-4 decisions in *American Express Co. v. Italian Colors Restaurant* ("*Amex*") and *AT&T Mobility LLC v. Concepcion*, which rigorously enforced arbitration agreements containing class action waivers.[1]  R&R at 1-2.  Magistrate Judge Reyes would be correct if this case were controlled by the federal common law of arbitration under which *Amex* and *Concepcion* were both decided.  However, it is not.  This case is instead controlled by the First Amendment of the Constitution, which bars the harsh results that *Amex* and *Concepcion* would otherwise dictate.

The Court of Appeals for the Third Circuit once noted that a meritorious constitutional argument, if raised, would override the Supreme Court's interpretations of the Federal Arbitration Act ("FAA").[2]  Plaintiff has raised a constitutional issue here.  In a matter of nationwide first impression, he asks this court to determine whether the FAA, as interpreted and applied in recent Supreme Court decisions, violates the Petition Clause of the First Amendment?

The question presented, more specifically, is whether judicial holdings that the FAA compels federal district courts to enforce *adhesion compulsory arbitration* agreements against

---

[1]  *See Amex*, 133 S. Ct. 2304 (2013); *Concepcion*, 131 S. Ct. 1740 (2011).

[2]  *See Homa v. American Express Co.*, 494 F. App'x 191, 196-97 (3d Cir. 2012) (while applying *Concepcion*, stating that "a court need not enforce an unconstitutional law but Homa does not raise any constitutional issues in this case and thus we do not address that possibility").

consumers interpret and apply the FAA in a manner that violates the consumers' fundamental First Amendment right under the Petition Clause to petition a government court?

The Petition Clause guarantees the right to sue in court. In cases not involving the FAA, the Supreme Court has long held – and in 2011 reaffirmed – that "the Petition Clause protects the right of individuals to appeal to *courts and other forums established by the government* for resolution of legal disputes."[3] But the Supreme Court has never considered whether its decisions interpreting the FAA under the federal law of arbitration conflict with the Petition Clause. Plaintiff asserts a conflict exists, and that his Petition Clause right to sue in court must be upheld.

Magistrate Judge Reyes recommends denying Plaintiff's First Amendment challenge based on two conclusions: (i) that *Amex* and *Concepcion* control the constitutional analysis; and (ii) that Plaintiff's argument requires the court to find that there is a constitutional right to bring a class action. R&R at 17-18. Plaintiff respectfully disagrees, and objects to both conclusions.

As shown below, *Amex* and *Concepcion* do not govern the constitutional issue because no Petition Clause challenge was raised in those cases, and the inquiry courts must undertake when assessing a statute's constitutionality is more stringent than the statutory analysis the Court has employed in its FAA decisions. The constitutional analysis requires the FAA to be interpreted in a manner that protects Plaintiff's right to petition the courts, and it renders Defendants' adhesion compulsory arbitration clause unenforceable.

Plaintiff's class action lawsuit can proceed even if there is no constitutional right to bring a class action for two, independent reasons: First, an anti-severance provision in Defendants' arbitration clause contractually voids the class action waiver if any other part of the arbitration clause is found to be unenforceable. Second, under the Petition Clause analysis, the FAA does

---

[3] *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011) (citing *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-97 (1984)) (other citations omitted) (emphasis added).

not preempt governing South Dakota law in this case, and South Dakota law bars enforcement of class action waivers that work to exculpate defendants or leave plaintiffs without a remedy.[4]

## SUMMARY OF ARGUMENT

"Where a specific statute … conflicts with a general constitutional provision, the latter governs."[5]  Thus, if the FAA conflicts with the Petition Clause, the Petition Clause controls. Under the "constitutional avoidance doctrine," moreover – a longstanding canon of statutory interpretation applicable to constitutional challenges – if a state actor has construed a statute in a manner that conflicts with the Constitution, this court is constrained and compelled to adopt a reasonable alternative interpretation of the statute that avoids the conflict, unless the statute's text or legislative history reveals that Congress clearly intended the infringing construction.

As shown below, the constitutional avoidance doctrine precludes interpreting the FAA in a manner that violates the First Amendment Petition Clause and, consequently, bars enforcement of adhesion arbitration clauses like Defendants'.  A three-step analysis compels this conclusion:

*One*, Plaintiff's right under the Petition Clause to petition a government court to redress private wrongs is a fundamental First Amendment right that is just as sacrosanct as the freedoms of speech, press and religion.  Enforcing Defendants' arbitration provision would infringe this fundamental right by compelling Plaintiff to file this dispute before a private arbitrator rather than a government court.

*Two*, under the constitutional avoidance doctrine, the FAA must be construed to avoid violating the Petition Clause because (i) neither the FAA's text nor legislative history reflect a

---

[4] To be clear, Plaintiff objects only to R&R § II.D, which addresses Plaintiffs' constitutional challenge.  Plaintiff does not object to R&R §§ II.A.-C., which analyze Plaintiff's "exculpation" and "public injunction" arguments under the *presumption* that the FAA governs.  The R&R did not reach Plaintiff's argument that South Dakota law would bar enforcement of the class action waiver if the FAA does not preempt state law in this case.

[5] *Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 504 (2012).

clear intent by Congress to compel federal courts to enforce compulsory arbitration clauses that impair a citizens' right to petition a government tribunal; and (ii) the FAA can be reasonably construed to exclude adhesion arbitration contracts from its scope. Indeed, Congress's intent to exclude adhesion contracts is inherent in the FAA's text given the 1925 definitions of the words Congress wrote, and the FAA's legislative history confirms that Congress *unequivocally rejected* the notion that the FAA would apply to adhesion compulsory arbitration agreements.

*Three*, the Supreme Court's interpretations of the FAA do not control Plaintiff's Petition Clause challenge. In *Amex* and *Concepcion*, the FAA's constitutionality was presumed, and the Court construed the FAA by applying statutory interpretation principles that are more flexible than the constitutional avoidance analysis, which requires *evidence* that Congress *clearly intended* to impair consumers' Petition Clause rights. Because Congress revealed no such clear intent, the Court's interpretation that the FAA requires judicial enforcement of adhesion arbitration contracts against consumers cannot survive Plaintiff's Petition Clause challenge.

In sum, interpreting the FAA in light of the constitutional avoidance doctrine requires this court to examine the FAA's text and legislative history with a fresh eye to ascertain Congress' statutory intent. Upon doing so, the court should rule that the FAA does not compel courts to enforce adhesion arbitration clauses that work to waive an individual's fundamental right to access a government court, and Defendants' motion to compel arbitration should be denied.[6]

---

[6] As a threshold matter, Congress' enactment of the FAA and the Supreme Court's construction of it are state actions subject to constitutional challenge, as are court orders compelling arbitration. *See Denver Area Educ. Telecomm. Consortium v. FCC*, 518 U.S. 727, 737-40 (1996) (act of Congress that permits private actors to restrict citizens' free speech can constitute state action challengeable under First Amendment). *See also id.* at 782 (Kennedy, J., concurring in part, dissenting in part) (state action exists where "Congress singles out one sort of speech for vulnerability to private censorship" when Congress itself could not do so; "State action lies in the enactment of a statute altering legal relations between persons, including the selective

**ARGUMENT**

I.    **THE FIRST AMENDMENT PETITION CLAUSE COMPELS DENIAL OF DEFENDANTS' MOTION TO COMPEL ARBITRATION**

A.    **The First Amendment Guaranties the Right to Petition Government Courts**

Since our nation's birth, jurists have "viewed the right of access to court as 'fundamental'" to our democracy.[7] "In an organized society," the Supreme Court once observed, the "right to sue and defend in the courts" is "the right conservative of all other rights, and lies at the foundation of orderly government."[8] This "right of access to the courts," the Court has firmly held,[9] is grounded in the First Amendment right to "petition the Government for a redress of grievances,"[10] "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'"[11]

The right of petition is "inseparable" from the freedoms of speech, press and assembly and is one of four "cognate rights … united in the First [Amendment's] assurance."[12] The right of petition, therefore, is "a fundamental right within the protection of the First Amendment."[13]

---

withdrawal from one group of legal protections against private acts, regardless of whether the private acts are attributable to the State.") (citation omitted).

[7] Carol Rice Andrews, *A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right*, 60 Ohio St. L.J. 557, 563 (1999).  Professor Andrews' seminal article has been cited in Supreme Court opinions.  *See Guarnieri*, 131 S. Ct. at 2503, 2504 (Scalia, J., concurring); *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 532 (2002).

[8] *Chambers v. Baltimore & Ohio R.R Co.*, 207 U.S. 142, 148 (1907).  *Accord Daniels v. Arcade, L.P.*, 477 F. App'x 125, 130 (4th Cir. 2012).

[9] *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  *See also BE&K Constr.*, 536 U.S. at 524; *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983).

[10] U.S. Const. amend. I ("Congress shall make no law … abridging … the right … to petition the Government for a redress of grievances").

[11] *BE&K Constr.*, 536 U.S. at 524-25 (citing *United Mine Workers v. Ill. Bar Ass'n*, 389 U.S. 217, 222 (1967); *United States v. Cruikshank*, 92 U.S. 542, 552 (1876)).

[12] *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

[13] *United Trans. Union v. State Bar of Michigan*, 401 U.S. 576, 585 (1971).  *See also Ryland v. Shapiro*, 708 F.2d 967, 971 (5th Cir. 1983) ("The right of access to the courts … is well established today … [as] one of the fundamental rights protected by the Constitution.").

5

By its terms, the Petition Clause requires litigants to have access to *government* tribunals. In a 2011 opinion joined by seven Justices – issued two months after *Concepcion* was decided – the Supreme Court reiterated that its "precedents confirm that the Petition Clause protects the rights of individuals to appeal to *courts and other forums established by the government* for resolution of legal disputes."[14]

History supports the conclusion that the right of petition includes the right to seek redress in government courts as well as from the legislative and executive branches of government.[15] England's precursors to our right of petition included the right to petition the courts,[16] as did most of the American state constitutions issued during the post-revolutionary period governed by the Articles of Confederation.[17]  The progression of drafts of the Petition Clause leaves little doubt that the framers of the Bill of Rights intended to perpetuate that right.  The clause evolved from referring only to petitioning the "Legislature" to petitioning the entire "Government," including the Article III courts.[18]  The Constitution uses the word "Government" to refer to all three branches collectively.[19]  The Petition Clause's reference to the right to "petition the

---

[14] *Guarnieri*, 131 S. Ct. at 2494 (Kennedy, J., joined by Roberts, C. J., and Ginsburg, Breyer, Alito, Sotomayor, and Kagan, JJ.) (emphasis added).  Although two Justices expressed doubt that the right of petition includes the right to sue in court, *see id.* at 2501 (Thomas, J., concurring); *id.* at 2502-03 (Scalia, J. concurring), one, Justice Scalia, acknowledged that "scholars have made detailed historical arguments to the contrary," *id.* at 2504 (citing Andrews, *Right of Access*, 60 Ohio St. L.J. at 595-625, and James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government*, 91 Nw. U.L. Rev. 899, 903-62 (1997)) (other citation omitted).  Both Justices, moreover, had earlier joined the 2002 majority opinion in *BE&K Constr.*, 536 U.S. at 524-25, which unequivocally held that the Petition Clause protects the right to file a lawsuit.

[15] *See* Andrews, *Right of Access*, 60 Ohio St. L.J. at 595-625.

[16] *Id.* at 596-603 (citations omitted).

[17] *Id.* at 603-11 (citations omitted).

[18] *See* Pfander, *Sovereign Immunity*, 91 Nw. U.L. Rev. at 954-62 (citations omitted).

[19] *See id.* at 956-57 & n.210.

6

Government for a redress of grievances"[20] should be similarly construed.[21]   The fact that applicants to the Supreme Court are called "Petitioners," therefore, is no historical accident.

The Constitution, of course, does not include private arbitrators within any of the three branches of government established by Articles I, II and III, or mention them elsewhere.   To order Plaintiff to sue before a private arbitrator rather than this court, therefore, would violate his Petition Clause right to present his dispute to a "Government" tribunal.

### B.   Resolving Disputes in Court Advances Several First Amendment Interests that are Not Advanced by Private Arbitration

The right to sue in court is a constitutionally significant right for several reasons.   The Framers viewed petitions as a check on government power that enable citizens to "communicate their will" to those who controlled the levers of government.[22]   The Petition Clause empowers citizens to "have their voices heard" by public officials, including members of "the judiciary," which, "like the other branches of government, make and apply laws in ways that impact the everyday lives of American citizens."[23]   Providing individuals with direct access to government courts "gives people a feeling of justice and order in their government."[24]   Absent access to the courts, "the right to petition would have little significance in the constitutional scheme of things" because "[a]ccess to the courts is often the only method by which a person or a group of citizens

---

[20]   U.S. Const. amend. I.

[21]   *Cf. Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("identical words used in different parts of the same act are [presumptively] intended to have the same meaning").   *Accord* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 171 (2012) (discussing canon of "Presumption of Consistent Usage").

[22]   James Madison, House Debates (Aug. 15, 1789), *reprinted in* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 1096 (1971).   *See also* Andrews, *Right of Access*, 60 Ohio St. L.J. at 623 (The right of petition "started in England as a check on the King's power" and grew to become "a tool of individual justice").

[23]   Andrews, *Right of Access*, 60 Ohio St. L.J. at 624-25 (citations omitted).

[24]   *Id.* at 624.

may seek vindication of federal and state rights and ensure accountability in the affairs of government."[25]

The Supreme Court has found that the ability to file lawsuits in court advances several "first amendment interests involved in private litigation," including (i) the "public airing of disputed facts";[26] (ii) enabling "groups" of citizens to "use … *courts* to advocate their causes and points of view respecting resolution of their business and economic interests";[27] and (iii) to otherwise "raise matters of public concern … [and] promote the evolution of the law … [, all of which] adds legitimacy to the court system as a designated alternative to force."[28]

Compulsory arbitration before private arbitrators serves none of these core First Amendment interests. Private arbitrations are usually confidential, providing no public forum for airing disputed facts or advancing legal causes. Arbitrators' decisions are not reviewable by courts on the merits and have no precedential effect, so they do not develop the law.[29]

In short, the right to sue in court under the Petition Clause protects both an individual citizen's interest in speaking publically to power and society's interest in ensuring that the government hears and addresses private disputes in a manner that serves and advances justice for the public at large, but private arbitration does neither of those things. To interpret the FAA as a

---

[25] *Protect Our Mountain Env't, Inc. v. District Court of County of Jefferson*, 677 P.2d 1361, 1365 (Colo. 1984).

[26] *Bill Johnson's Rests.*, 461 U.S. at 743 (internal quotation and citation omitted).

[27] *BE&K Constr.*, 536 U.S. at 525 (quoting *California Motor Transport*, 404 U.S. at 511) (internal quotation marks omitted) (emphasis added in *BE&K*). *See also Guarnieri*, 131 S. Ct. at 2500 (litigation facilitates "effective political expression" and "the informed public participation that is a cornerstone of democratic society") (internal quotation marks and citation omitted).

[28] *BE&K Constr.*, 536 U.S. at 532 (citing Andrews, *Right of Access*, 60 Ohio St. L.J. at 656).

[29] *See* Margaret L. Moses, *Statutory Misconstruction: How The Supreme Court Created A Federal Arbitration Law Never Enacted By Congress*, 34 Fla. St. U.L. Rev. 99, 144 (2006); Jean R. Sternlight, *Creeping Mandatory Arbitration: Is It Just?*, 57 Stan. L. Rev. 1631, 1661-62 & nn.146-52, 1664 & nn.165-66, 1672 (2005) (citations omitted).

statute that forces citizens into private arbitration not only violates the Petition Clause's expressly guarantied right to sue in court, it undermines both the public and private First Amendment interests that the Petition Clause was designed to promote.

Plainly, the FAA, as applied by the Supreme Court, abridges the First Amendment.

### C.   The Constitutional Avoidance Doctrine Bars Courts from Interpreting the FAA in a Manner that Deprives Citizens of their Right to Petition the Courts

Under constitutional law principles, courts cannot "'lightly impute to Congress an intent to invade ... freedoms' protected by the Bill of Rights, such as ... 'the right of access to the courts.'"[30]   Courts must also "give the benefit of any doubt to protecting rather than stifling First Amendment rights.[31]   Statutes that impinge upon the First Amendment are accordingly subject to "strict scrutiny" and will be declared unconstitutional unless Congress had a compelling justification for enacting the infringing law.[32]   Before even reaching the strict scrutiny test, however, courts facing constitutional challenges must try to interpret the statute in a manner that avoids the potential constitutional problem.   The Supreme Court has long held that if a statute that can be construed as limiting a constitutional right is "reasonably susceptible of two interpretations," it is the judiciary's "plain duty to adopt that construction which will save the statute from constitutional infirmity."[33]   This "doctrine of constitutional avoidance"[34] is a "cardinal principle" and "has so long been applied" by the Court "that it is beyond debate."[35]

---

[30] *BE&K Constr.*, 536 U.S. at 525 (citations omitted).

[31] *Citizens United v. FEC*, 558 U.S. 310, 327 (2010) (internal quotations and citations omitted).

[32] *Id.* at 340 (discussing freedom of speech).

[33] *United States ex rel. Att'y Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 407 (1909) (citation omitted).   *Accord* Scalia & Garner, *Reading Law*, at 247-51 (discussing "Constitutional-Doubt Canon" of construction).

[34] *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 565-66 (2009) (Breyer, J., dissenting) (citing *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must be construed, if fairly

Under the constitutional avoidance doctrine, if an interpretation of a statute "would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."[36] To ascertain whether Congress intended to infringe the Constitution, courts must assess "'every reasonable construction'" of the statutory text "'in order to save [it] from unconstitutionality,'"[37] and must adopt a constitutional construction "unless there is *the clearest indication*" in the statutory text or legislative history that Congress intended the unconstitutional interpretation.[38]

Two Supreme Court cases applying this analytical framework should guide this court's inspection of the FAA under the Petition Clause. In *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Corp.*, the Court addressed whether the National Labor Relations Board ("NLRB" or "Board") had interpreted the National Labor Relations Act ("NLRA") in a way that infringed a union's freedom of speech. Because the NLRA makes it unlawful to "'coerce or restrain any person' to cease doing business with another,"[39] the Board ruled that the union could not distribute handbills urging shoppers to boycott a mall's retail stores.[40] The Court held that the statutory language showed no "clear indication" that handbilling alone (that is,

---

possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.")).

[35] *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citing *Murray v. The Schooner Charming Betsy*, 6 U.S. 64, 118 (1804) (Marshall, C. J.)) (other citations omitted).

[36] *Id.* at 575.

[37] *Id.* (citing *Hooper v. California*, 155 U.S. 648, 657 (1895)) (emphasis added). *See also id.* at 577 (even if a potentially unconstitutional reading of a statute is "a permissible one, … we must independently inquire whether there is another interpretation, not raising these serious constitutional concerns, that may fairly be ascribed" to the statute).

[38] *Id.* at 577 (quoting *NLRB v. Drivers*, 362 U.S. 274, 284 (1960)) (emphasis added).

[39] *Id.* at 578; *see id.* at 572 n.2 (quoting NLRA, 29 U.S.C. § 158(b)(4)(ii)(B)).

[40] *Id.* at 570-74.

unaccompanied by picketing) was deemed by Congress to be coercive and unlawful.[41] The Court also ruled that other statutory language, which the Board argued supported its reading of the statute, "need not be read" the way the Board read it; although the Board's reading was reasonable, it also could be interpreted in a manner that did not threaten the First Amendment.[42]

The Court likewise found no "clear indication" in the "legislative history that Congress intended [the NLRA] to proscribe peaceful handbilling, unaccompanied by picketing."[43] Although some evidence supported the Board's view, the legislative record fell "far short of revealing" a "clear intent" to infringe the Constitution.[44] Because a reading consistent with the First Amendment was "*not foreclosed* either by the language of the section or its legislative history," the Court adopted that construction to avoid "the serious constitutional questions that would be raised by the Board's understanding of the statute."[45]

In *BE&K Construction Co. v. NLRB*, the Court addressed the Petition Clause itself, and it refused to read the NLRA in a way that infringed an employer's right to access the courts. The Board had ruled that the employer's retaliatory lawsuit had violated the NLRA's ban against "interfering with, restraining, or coercing employees" who were engaging in protected union activity.[46] While the Court agreed that the statutory language "might be read" to reach such retaliatory lawsuits, the Court declined to adopt the Board's interpretation "[b]ecause there is nothing in the statutory text indicating that [it] *must be read*" that way.[47] In language equally

---

[41] *Id.* at 580.

[42] *Id.* at 582-83.

[43] *Id.* at 583-84.

[44] *Id.* at 588.

[45] *Id.* (emphasis added).

[46] 536 U.S. at 536 (emphasis added). *See also id.* at 524-33 (analyzing Petition Clause).

[47] *Id.* at 536.

11

pertinent to the FAA as the NLRA, the Court stated that "any concerns related to the right to petition must be greater when enjoining … litigation than when penalizing completed litigation" because "the First Amendment historically provides greater protections from prior restraints than after-the-fact penalties, … and enjoining a lawsuit could be characterized as a prior restraint."[48]

These two cases demonstrate that, under the avoidance doctrine, the FAA cannot be construed as directing federal courts to enforce adhesion arbitration contracts that deprive citizens of their right to petition the courts unless the 1925 Congress clearly intended that result. To find the requisite "clear intent,"[49] every reasonable construction that would preserve the right to petition the courts "*must be*"[50] "*foreclosed*"[51] by the FAA's text or legislative history.[52]

As shown below, the requisite "clear intent" cannot be found in either.

### 1. The FAA's Text Does Not Evidence that Congress had a Clear Intent to Impinge the Petition Clause

The FAA's operative language appears in section 2, which provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.[53]

Three canons of statutory construction are relevant to the analysis of this text: *First*, terms that are not defined in the statute are typically construed in accordance with the ordinary

---

[48] *Id.* at 530 (citing *Alexander v. United States*, 509 U.S. 544, 553-54 (1993)).

[49] *Edward J. DeBartolo*, 485 U.S. at 584-88.

[50] *BE&K Constr.*, 536 U.S. at 536 (emphasis added).

[51] *Edward J. DeBartolo*, 485 U.S. at 588 (emphasis added).

[52] The avoidance doctrine, of course, also applies outside of the labor context. *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 405-06 (2010) (criminal statute); *Gonzalez v. Carhart*, 550 U.S. 124, 153-54 (2007) (abortion statute); *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 495-96 (2d Cir. 2007) (signage ordinance).

[53] 9 U.S.C. § 2.

dictionary meanings of those words at the time Congress enacted the statute.[54]  *Second*, statutory text is typically construed in light of Congress' understanding of the law at the time of its enactment.[55]  *Third*, statutory words cannot be viewed in isolation and must be construed in context with "the provisions of the whole law, and to its object and policy."[56]

Applying these principles, the reading that Congress did not intend adhesion compulsory arbitration contracts to fall within the FAA's scope is not only reasonable, it is inherent based on the words Congress used.  Section 2 does not say the FAA applies to "any contract" to arbitrate. It says the FAA applies to "a contract evidencing a transaction involving commerce" that calls for arbitration.  Critically, as discussed below, the bill that became the FAA *did* initially use the words "any contract," but Congress revised the final text to narrow the FAA's scope, so that the FAA applied only to "a contract evidencing a transaction involving commerce."[57]

In 1925, that phrase did not include adhesion contracts with individuals.  The ordinary meanings of the first six words in the phrase were largely the same then as they are now.[58]  But

---

[54] *Kouichi Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002-03 (2012) (citation omitted).  *Accord* Scalia & Garner, *Reading Law*, at 78-92 ("Fixed-Meaning Canon").  *See also id.* at 85 (construing a statute as of the time it was written "prevents … [a] nine-person (or indeed five-person) … revision" of the statute by the Supreme Court).

[55] *Thompson v. Thompson*, 484 U.S. 174, 180 (1988) ("We examine initially the context of the [statute] with an eye toward determining Congress' perception of the law that it was shaping or reshaping … [a]t the time Congress passed the [statute].") (citation omitted). *See also Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 286, 292 (1995) (Thomas, J., dissenting) (the FAA must be interpreted as of "the time of [its] passage in 1925" – a "later development" in the law "does not mean [it was] so understood in 1925" and "could not change the original meaning of the statute that Congress enacted in 1925").

[56] *Maracich v. Spears*, 133 S. Ct. 2191, 2203 (2013) (citations omitted).

[57] *See infra* at 17, 21-22.

[58] *See Webster's New Modern English Dictionary (Illustrated)* 202, 305, 850, 469 (1925) ("*Webster's* 1925").  Excerpts from this dictionary appear at Tab A of the Appendix of Historical Materials Submitted in Support of Plaintiff's Objection to Magistrate Judge's Report and Recommendation ("Plaintiff's Appendix").

the meaning of "commerce" was different.   Section 1 of the FAA defines "commerce" as follows: "'commerce' … means commerce among the several States or with foreign nations" (or in U.S. Territories, in the District of Columbia, or among and between any of them and any State or foreign nation).[59]   Because the statutory definition of "commerce" itself uses the generic word "commerce," resort to the ordinary meaning of "commerce" is needed and adds clarity.   In 1925 – the year Calvin Coolidge took office – "commerce" was defined as the "interchange of merchandise on a large scale between nations or individuals."[60]

Thus, a reasonable reading of the phrase "a contract evidencing a transaction involving commerce," as of 1925, is that it meant a "contract involving an interstate or foreign exchange of merchandise on a large scale" – or, in other words, a "contract among large-scale merchants."[61]

The reasonableness of that interpretation is enhanced by the fact that it is consonant with the state of the law in 1925, when constitutional jurisprudence limited the Commerce Clause's reach to what was then considered "commerce" – interstate and foreign business transactions. All manufacturing of goods, employment of workers and other services such as insurance contracts, for example, were deemed at that time to be intrastate activities outside of Congress' regulatory purview, even if the goods or services were ultimately intended for out-of-state or foreign markets.[62]   It makes perfect sense that the 1925 Congress would not want to reach beyond the bounds of its then-perceived Commerce Clause power when enacting the FAA.

---

[59]  9 U.S.C. § 1.

[60]  *Webster's* 1925 at 188.

[61]  Not only is that a reasonable interpretation given the ordinary meanings of the words Congress used, as shown below, the FAA's legislative history demonstrates it is the *only* type of contract to which the FAA was meant to apply.  *See infra* at 16-22.

[62]  *See Hammer v. Dagenhart*, 247 U.S. 251, 271-72 (1918) (Commerce Clause enables Congress to "regulate transportation among the States" and the interstate purchase and sale of goods; employment of child labor to manufacture goods is not "commerce," even if the goods are

Congress' focus on large-scale interstate and foreign transactions reveals that it intended the FAA to cover only arbitration agreements between large merchants, who would have had relatively equal bargaining power, not compulsory adhesion agreements imposed by corporations on individual consumers.  That is certainly one reasonable interpretation, even if it is not the only one.  The FAA's operative language, therefore, does not evince a "clear intent" by Congress to permit powerful firms to deprive consumers of their First Amendment right to petition a government court.  While the FAA's text "might be read" to reach adhesion compulsory arbitration contracts that infringe the right of petition, "it need not be read so broadly."[63] Certainly, a reasonable construction that is consistent with the Petition Clause – *i.e.*, that the FAA does not apply to adhesion compulsory arbitration contracts – is not "foreclosed."[64]

### 2. The FAA's Legislative History Does Not Evidence that Congress had a Clear Intent to Impinge the Petition Clause

Because the statutory text is not dispositive, the avoidance doctrine requires reviewing the FAA's legislative history for evidence that Congress clearly intended to infringe the Petition Clause by including adhesion contracts within the FAA's scope.  The "unambiguous" legislative record,[65] however, reveals the opposite: it shows Congress *expressly rejected* allowing powerful parties to use adhesion contracts to force weaker parties to submit to compulsory arbitration.

---

ultimately "intended for interstate commerce"); *Paul v. Virginia*, 75 U.S. 168, 183-84 (1869) (insurance policies not "articles of commerce" even if made between parties in different states; nor would "a contract for the purchase and sale of goods in Virginia by a citizen of New York whilst in Virginia … constitute a portion of such commerce").  The Supreme Court has recognized that "[t]he pre-New Deal Congress that passed the [FAA] in 1925 might well have thought the Commerce Clause did not stretch as far as has turned out to be the case." *Allied-Bruce Terminix*, 513 U.S. at 275.

[63] *BE&K Constr.*, 536 U.S. at 536.

[64] *Edward J. DeBartolo*, 485 U.S. at 588.

[65] "One rarely finds a legislative history as unambiguous as the FAA's." *Southland Corp. v. Keating*, 465 U.S. 1, 25 (1984) (O'Connor, J., dissenting).

The FAA's enactment was spearheaded by a New York cotton merchant, Charles Bernhemier, and a New York lawyer, Julius Cohen, who sought a federal complement to New York's statute making arbitration agreements enforceable in New York state courts.[66] Their only aim was "to get a Federal law to cover interstate and foreign commerce and admiralty."[67]

The bill that became the FAA was initially the subject of a hearing held on January 31, 1923 before a subcommittee of the Senate Committee on the Judiciary.[68] Bernheimer testified there that he had studied arbitration in the United States and abroad since 1908, including both "compulsory arbitration" arising from membership in a trade organization and "arbitration in the form of a completely voluntary act, by insertion of an arbitration clause in the contract."[69] Bernheimer did not ask Congress to approve imposing compulsory or involuntary arbitration on consumers through adhesion contracts. Instead, Bernheimer repeatedly emphasized that the bill's purpose solely was to "enable business men to settle their disputes expeditiously and economically"[70] by making enforceable "written agreements voluntarily entered into."[71]

---

[66] *See* Moses, *Statutory Misconstruction*, 34 Fla. St. U.L. Rev. at 101-03. *See also* David S. Schwartz, *Correcting Federalism Mistakes in Statutory Interpretation: The Supreme Court and the Federal Arbitration Act*, 67 Law & Contemp. Prob. 5, 16-17 (2004).

[67] *See* Plaintiff's Appendix, Tab C, *Arbitration of Interstate Commercial Disputes: Hearings on S. 1005 and H.R. 646 Before the J. Comm. of Subcomms. on the Judiciary*, 68th Cong. 16 (1924) ("1924 *Joint Hearing*") (statement of Julius Henry Cohen).

[68] *See* Plaintiff's Appendix, Tab B, *Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal Commercial Arbitration: Hearings on S. 4213 and S. 4214 Before a Subcomm. of the S. Comm. on the Judiciary*, 67th Cong. (1923) ("1923 *Senate Hearing*").

[69] *Id.* at 1.

[70] *Id.* at 2 (quoting Report of Committee on Commerce, Trade and Commercial Law of the American Bar Association (1922)). *See also id.* (bill was "[i]n the interest of the preservation of commodities, particularly foodstuffs and the elimination of waste in all commercial endeavors"); *id.* at 3 (bill will "establish and maintain business amity"); *id.* at 3-7 (always discussing "merchants," "merchants' arbitrators," or arbitrations before "a trade body"); *id.* at 8, 9 (statement of W.H.H. Piatt, Esq.) (bill advanced "commercial" arbitration; "It is purely an act to give the merchants the right or the privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now, that is all there is in this."). *See also* Moses,

The notion that the bill that became the FAA should apply to adhesion contracts was explicitly rejected by both the Senate subcommittee members and the bill's proponents. As originally introduced in Congress, the operative substantive language in section 2 of the bill differed from its final text in that it would have enforced "a written provision in *any* contract *or* maritime transaction *or* transaction involving commerce to settle by arbitration …."[72]

Senator Thomas J. Walsh of Montana objected to the bill as written because it would include adhesion contracts (called "take it or leave it" contracts at the time). Walsh, a former plaintiff's lawyer, was a powerful Democratic Senator who had recently led the Teapot Dome investigation and later chaired both the 1924 and 1932 Democratic National Conventions.[73] Senator Walsh had the following exchange with W.H.H. Piatt, who chaired the American Bar Association Committee on Commerce, Trade and Commercial Law, a bill proponent:[74]

> Mr. PIATT: … [The bill] is purely an act to give the merchants the right or privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now, that is all there is in this.
>
> Senator WALSH … : This has occurred to me. I see no reason at all … why, when two men voluntarily agree to [s]ubmit their controversy to arbitration, they should not be compelled to have it decided that way.
>
> Mr. PIATT: Yes, sir.
>
> Senator WALSH … : The trouble about the matter is that a great many of these contracts that are entered into *are really not voluntary things at all*. Take an

---

*Statutory Misconstruction*, 34 Fla. St. U.L. Rev. at 106 ("The hearings make clear that the focus of the Act was merchant-to-merchant arbitrations, never merchant-to-consumer arbitrations.").

[71] 1923 *Senate Hearing* at 2.

[72] *See id.* at 2 (statement of Charles Bernheimer, reading original bill language) (emphasis added). *See also* Schwartz, *Correcting Federalism,* 67 Law & Contemp. Prob. at 21 (quoting H.R. 646, 65 Cong. Rec. 11,081 (daily ed. June 6, 1924)).

[73] *See* http://en.wikipedia.org/wiki/Thomas_J._Walsh; Schwartz, *Correcting Federalism*, 67 Law & Contemp. Prob. at 21.

[74] 1923 *Senate Hearing* at 7.

insurance policy; there is a blank in it. You can take that or you can leave it. …
Either you can make that contract or you can not make any contract. It is the same
with a good many contracts of employment. A man says "These are our terms. All
right, take it or leave it." Well, there is nothing for the man to do except to sign it;
and then he surrenders his right to have his case tried by the court, and has to have
it tried before a tribunal in which he has no confidence at all.

Mr. PIATT: That would be the case in that kind of a case, I think; but it is not the
intention of this bill to cover insurance cases.[75]

Senator Walsh then raised other examples of adhesion contracts, such as "a freight
contract" for the shipment of cattle, a "regular form of contract for the shipment of goods" and
bills of lading,[76] which prompted the following additional exchange:

Mr. PIATT: … I would say I would not favor any kind of legislation that would
permit the forcing a man to sign that kind of contract. …

Senator WALSH … : You can see where they are not really voluntary contracts,
in a strict sense.

Mr. PIATT: I think that ought to be protested against, because it is the primary
end of this contract that it is a contract between merchants one with another,
buying and selling goods. The shipper is nearly always under a necessity.[77]

Senator Walsh agreed that a shipper is usually under a necessity to ship his goods
promptly, and pointed out that even though the common law discouraged it, railroads still
insisted on putting "restrictions and conditions in their contract" so that the shipper, as a practical
matter,

is really obliged to take the contract as it is put up to him. He has got to sign his
name there, with all the chances there are to it. And that is one reason why most
of the States have legislated – my State among others – that no provision in the
contract shortening the time of the statute of limitations be valid: *because the*

---

[75] *Id.* at 9 (emphasis added).

[76] *Id.* at 9-10.

[77] *Id.* at 10.

18

*tendency is to put terms in that will give him no real opportunity to prosecute his action.*[78]

Senator Thomas Sterling of South Dakota, who chaired the subcommittee, asked if an amendment Piatt had suggested earlier would cover the types of adhesion contracts that Senator Walsh suggested should not fall within the scope of the bill.  Senator Walsh likewise asked Piatt to "think of some way by which that objection could be obviated."[79]

Senator Walsh concluded by stating that "I really believe that in the class of cases that Mr. Bernheimer has in mind" (*i.e.*, voluntary contracts between merchants), the bill "would be a very useful thing, and I would be disposed to favor it; but I can see that difficulty" – to which Piatt responded:  "I can see it, too. … That point has never been raised by anybody objecting to it in the forcible way you have."[80]  Piatt stated that he would "take this angle up at once" with the other members of his ABA committee.[81]

The bill's proponents made some revisions, and the bill was reconsidered the next year at a January 9, 1924 joint hearing before subcommittees of the House and Senate Committees on the Judiciary.[82]  The bill's supporters again emphasized that the bill's purpose was to enforce arbitration agreements among commercial merchants and trade association members engaged in interstate commerce[83] that were "voluntarily" and "solemnly" entered into.[84]

---

[78]  *Id.* (emphasis added).   Senator Walsh pressed on, stating that form architect, railroad construction and fire and life insurance contracts also frequently included arbitration clauses.  *Id.* at 10-11.  He very clearly did not want powerful parties using arbitration clauses that would give ordinary citizens, like Plaintiff Frankel, "no real opportunity to prosecute his action." *Id.*

[79]  *Id.* at 11.

[80]  *Id.*

[81]  *Id.*

[82]  *See* Plaintiff's Appendix, Tab C, 1924 *Joint Hearing* at 1, 11.

[83]  *See id.* at 7 (statement of Charles Bernheimer) ("the ordinary, everyday trade disputes, … it is for them that this legislation is proposed"; it relates "entirely" to contracts arising in interstate

19

Senator Walsh was unable to attend the joint hearing,[85] but adhesion contracts came up after Senator Sterling, who again chaired the hearing, asked Julius Cohen why courts had refused to specifically enforce arbitration agreements. Cohen said that "the real fundamental" reason was that they often appeared in *adhesion contracts*, or in Cohen's words, because "the stronger men would take advantage of the weaker" when contracting:

> [T]he real fundamental cause was that at the time this rule was made people were not able to take care of themselves in making contracts, and the stronger men would take advantage of the weaker, … and the courts said, "If you let the people sign away their rights, the powerful people will come in and take away the rights of the weaker ones." And that's still true to a certain extent.[86]

Cohen's point that courts disliked adhesion arbitration contracts was supported by the case law of the day.[87] This exchange between Senator Sterling and Cohen reveals that – insofar as the 1925 Congress that enacted the FAA was concerned – the "judicial hostility" to arbitration

---

commerce – "[t]he farmer who will sell his carload of potatoes, from Wyoming, to a dealer in the State of New Jersey, for instance"; enforcing arbitration among merchants "preserves business friendships … raises business standards … [and] maintains business honor"); *id.* at 12 (statement of R.S. French) (bill will enable enforcement of arbitration provisions in constitutions and by-laws of several trade organizations whose members "are large exporters and importers of perishable goods"); *id.* at 13, 14 (statement of Julius Henry Cohen) (purpose of bill is "to make the disposition of business in the commercial world less expensive and more expeditious"; if "we have confidence in [a man's] ability to understand complex commercial situations and in his sense of right and justice" and "agree to settle on the terms that these gentlemen say is proper," that agreement should not be subject to repudiation); *id.* at 41 (brief in support of bill written by Julius Henry Cohen) ("If business men desire to submit their disputes to speedy and expert decision, why should they not be enabled to do so?").

[84] *Id.* at 26 (statement of Alexander Rose) ("Arbitration … is a purely voluntary thing. It is only the idea that arbitration may now have the aid of the court to enforce these provisions which men voluntarily enter into."); *id.* at 35 (brief in support of bill written by Julius Henry Cohen) (refusal to arbitrate often results from a man's "having no respect for his obligation solemnly assumed").

[85] *Id.* at 1.

[86] *Id.* at 14-15.

[87] *See, e.g., Parsons v. Ambos*, 121 Ga. 98, 101 (1904) ("By first making the contract and then declaring who should construe it, the strong could oppress the weak, and in effect so nullify the law as to secure the enforcement of contracts usurious, illegal, immoral, or contrary to public policy.").

to which the Supreme Court often refers[88] arose largely from the courts' disdain for enforcing adhesion arbitration clauses. Moreover, it shows that the bill's supporters and Chairman Sterling (as well as Senator Walsh) *shared that disdain.*

It seems plain from what happened next that Congress *codified that judicial hostility* by excluding adhesion arbitration contracts from the FAA's scope and enacting a statute that required judicial enforcement *only* of arbitration contracts that were voluntarily signed by merchants engaged in interstate and foreign commerce.

At the time of the Joint Hearing, the bill still included the broad "*any* contract *or*" language. But the May 1924 Senate Report submitted by Senator Sterling amended the Senate version of the bill to change the words "any contract or" into its present form referring to "a contract evidencing a transaction involving commerce."[89] Identical changes were made by the Senate to the House version of the bill on January 31, 1925.[90] These textual changes "were made at the behest of Senator ... Walsh"[91] and have been referred to as "the Walsh Amendment."[92]

By revising the statute from one that applied to "*any contract* or maritime transaction or transaction involving commerce" to one that applied only to "any maritime transaction or *a contract evidencing a transaction involving commerce,*" Congress restricted the scope of the FAA, transforming it from a statute providing a "blanket ... rule" applying to "all contracts" brought before federal courts to one that applied only to contracts involving interstate commerce

---

[88] *E.g., Amex,* 133 S. Ct. at 2308-09.

[89] *See* Plaintiff's Appendix, Tab D, S. Rep. 68-536, at 1-2 (1924) ("Senate Report").

[90] *See* Plaintiff's Appendix, Tab E, 66 Cong. Rec. 2759 (1925).

[91] Schwartz, *Correcting Federalism,* 67 Law & Contemp. Prob. at 21 & n.103 (citing 66 Cong. Rec. S2761 (daily ed. Jan. 31, 1925)). *See also* Plaintiff's Appendix, Tab E, 66 Cong. Rec. at 2761 (statement of Senator Sterling).

[92] Schwartz, *Correcting Federalism,* 67 Law & Contemp. Prob. at n.109 (citations omitted).

21

(as then understood) or admiralty.[93]  The Senate Report styled the bill as one "To Make Valid and Enforceable *Certain* Agreements for Arbitration," not "All Agreements."[94]  Importantly, the Senate Report emphasized that the bill had defined "maritime transactions" and "commerce" in section 1 as a limiting device: that is, to "show[] *to what contracts in interstate or foreign commerce* the bill will be applicable."[95]  The Senate Report also stated that the record "shows not only the great value of *voluntary* arbitrations but the practical justice of enforced arbitration of disputes where written agreements for that purpose have been *voluntarily* and *solemnly* entered into."[96]  A written agreement "voluntarily and solemnly" entered into – in 1925 – meant that it had to result from a serious and formal exercise "of choice or free will."[97]

The chair of the House Judiciary Committee, Representative George S. Graham of Pennsylvania, confirmed Congress' intent on the House floor, stating: "This bill simply provides for one thing, and that is to give an opportunity to enforce an agreement in commercial contracts and admiralty contracts – an agreement to arbitrate, when voluntarily placed in the document by the parties to it."[98]  That intent is not contradicted anywhere in the unambiguous legislative record, and the FAA's approval by both houses "without a single negative vote" evidences that Congress' intent in that regard was unequivocal.[99]

---

[93]  *Id.* (citations omitted).

[94]  Senate Report at 1 (emphasis added).

[95]  *Id*. at 2 (emphasis added).

[96]  *Id*. at 3 (emphasis added).

[97]  *See* Plaintiff's Appendix Tab A, *Webster's* 1925 at 894; ("Voluntary" meant "acting from choice or free will"); *id*. at 768 ("Solemn" meant "characterized by religious rites or ceremonies; inspiring awe; serious; devout; formal; attended with a serious appeal to God").

[98]  *See* Plaintiff's Appendix Tab F, 65 Cong. Rec. 1931 (1924).

[99]  Moses, *Statutory Misconstruction*, 34 Fla. St. U.L. Rev. at 110, 112 & n.81 (quoting American Bar Association, *The United States Arbitration Law and Its Applications*, 11 A.B.A.J. 153 (1925)).  *See also* Plaintiff's Appendix Tab E, 66 Cong. Rec. 2759-62 (1925).

The legislative history plainly does not reflect a "clear intent" by Congress to require federal courts to enforce adhesion compulsory arbitration clauses that deprive citizens of their First Amendment right to access a government tribunal. Based on the above, in fact, it is beyond debate that Congress' intent was precisely the opposite. Accordingly, under the avoidance doctrine, the FAA should not be interpreted to apply to adhesion arbitration agreements.

### D.     The Supreme Court's FAA Decisions are Inapposite

Although the Supreme Court has in recent years applied the FAA to adhesion contracts and enforced such contracts against individual consumers, its opinions have not addressed a constitutional challenge or applied the avoidance doctrine. The Court's FAA cases, therefore, do not control this court's plenary consideration of the First Amendment Petition Clause issue.[100]

The Court's recent FAA cases are distinguishable, moreover, because the Court has used "dynamic" statutory interpretation to give itself flexibility to construe the FAA based on what its text means *today* rather than what it meant in 1925.[101] In *Concepcion*, the Court applied the statute to adhesion consumer contracts because "the times in which consumer contracts were

---

[100] A precedent interpreting a statute may be found not controlling if "a constitutional question is raised by the Court's prior interpretation." Schwartz, *Correcting Federalism*, 67 Law & Contemp. Prob. at 47. *See, e.g.*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 77-78 (1938) ("If only a question of statutory construction were involved, we should not be prepared to abandon a doctrine so widely applied throughout nearly a century. But the unconstitutionality of the course pursued has now been made clear and compels us to do so.") (overruling *Swift v. Tyson*, 41 U.S. 1 (1842)). *See also Citizens United*, 558 U.S. at 363 ("This Court has not hesitated to overrule decisions offensive to the First Amendment.").

[101] *See* Schwartz, *Correcting Federalism*, 67 Law & Contemp. Prob. at 27 ("dynamic" statutory interpretation enables a court to "attribut[e] a policy or purpose to a statute to address issues not contemplated when the statute was enacted … and effectuate related but unanticipated policy judgments that arose in later times, so long as the interpretation is not contradicted by the statute's language or intent"). That the Supreme Court's conservative majority has used this mode of analysis in connection with the FAA is ironic, to say the least. Based on Schwartz's definition, however, the Court's analyses violated the principle that a dynamic interpretation cannot be "contradicted by the statute's … intent." *Id.*

anything other than adhesive are long past."[102]  In *Circuit City Stores, Inc. v. Adams*, the Court used a "variable standard" to derive the meaning of "commerce" under the modern Commerce Clause rather than Congress' far narrower 1925 understanding.[103]  While the Court has leeway to employ dynamic statutory interpretation in everyday statutory interpretation cases, it has no such leeway under the avoidance doctrine if its dynamic interpretation is potentially unconstitutional.

In the context of this Petition Clause challenge, the Supreme Court's dynamic interpretations of the FAA under the federal law of arbitrability can be ignored if a reasonable and constitutional alternative construction exists.  As shown above, such a construction of the FAA does exist, and it happens to have the added benefit of being the construction Congress actually intended.  Accordingly, this court is not bound by *Amex*, *Concepcion* or *Circuit City*'s contrary interpretations.  Even if reasonable, the Supreme Court's interpretations are not founded on the "clear intent" of Congress and place the FAA's constitutionality in serious doubt.  Under the avoidance doctrine, therefore, they must be rejected in favor of the reasonable alternative interpretation that the FAA does not apply to adhesion compulsory arbitration contracts.

## II.   DEFENDANTS' CLASS ACTION WAIVER IS NOT ENFORCEABLE

Because Defendants' arbitration clause is unenforceable, the class action waiver in that clause also becomes unenforceable, for two independent reasons.  First, the final version of the arbitration clause sent to Mr. Frankel contained a non-severance provision stating that if "any portion" of the arbitration clause is found to be unenforceable "the entire arbitration provision shall not remain in force."[104]  Thus, the class action waiver is unenforceable under its own terms.

---

[102]   131 S. Ct. at 1750 (citations omitted).

[103]   *Circuit City*, 532 U.S. 105, 116-18 (2001).  The Court conceded, however, that "the historical arguments respecting Congress' understanding … in 1925 are not insubstantial."  *Id.* at 119.

[104]   *See* Dkt. No. 17 ("Walters Decl."), at ¶ 25 and Ex. P at 3.

Second, because the FAA does not apply to Defendants' compulsory arbitration clause, the FAA does not preempt South Dakota's constitution or unconscionability law, which prohibit enforcing any contract terms that work to insulate a party from liability or deprive a party of a legal remedy.[105]   The R&R (at 2) accepts that Plaintiff Frankel's concerns that he would have no remedy absent a class action "are well-taken."   This court should as well, for the reasons stated in Plaintiff's brief in opposition to Defendants' motion to compel.   *See* Dkt. No. 23, at 8, 21-22.

## CONCLUSION

Enforcing Defendants' adhesion arbitration clause would violate Plaintiff's fundamental First Amendment right to access a government court.   Defendants' motion to compel arbitration should be denied, and this class action should be permitted to proceed in this court.

Dated: September 29, 2014

<div style="margin-left:40%">

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By:  /s/Alexander H. Schmidt
     Alexander H. Schmidt
Jeffrey G. Smith
270 Madison Avenue
New York, New York 10016
(212) 545-4600

**HARRY I. KATZ, P.C.**
61-25 Utopia Parkway
Fresh Meadows, New York 11365
(718) 463-3700

***Attorneys for Plaintiff Mark Frankel***

</div>

---

[105] *See Braun v. E.I. du Pont de Nemours & Co.*, No. CIV 04-1007, 2006 U.S. Dist. LEXIS 37431, at *21 n.4 (D.S.D. Feb. 7, 2006) (South Dakota constitution "has been read as a guarantee that the courts shall be open and afford those remedies provided for by the common law and statutes of the state") (citing *Kyllo v. Panzer*, 535 N.W.2d 896, 900-01 (S.D. 1995)); *Durham v. Ciba-Geigy Corp.,* 315 N.W.2d 696, 700 (S.D. 1982) ("One-sided agreements whereby one party is left without a remedy for another party's breach are oppressive" and "unconscionable"; contract terms are improperly exculpatory if they leave aggrieved party "without any substantial recourse for his loss"); *Nature's 10 Jewelers v. Gunderson*, 648 N.W.2d 804, 811 (S.D. 2002) (Konenkamp, J., dissenting) (arbitration clauses unenforceable if "'remedies available in [that forum] are so inadequate that enforcement would be fundamentally unfair'") (citation omitted).